15 minutes per side. Case number 14-3412 Nelida Lopez v. American Family Insurance Company et al. Oral argument. 15 minutes per side. Court is adjourned. Make for the appellant. You may proceed. Good morning. Good morning. May it please the Court. My name is Sarah Baker, and I represent the appellant Nelida Lopez, a 53-year-old Hispanic woman who at the time of her termination and displacement was the second oldest and only minority applicant for the district manager realignment. This court should remand this matter because issues of material fact exist. The district court erred by making credibility judgments, weighing evidence, and failing to construe the evidence in a light most favorable to Ms. Lopez. The record supports two key points. One, that race was a motivating factor in Ms. Lopez's displacement and termination, and two, that Ms. Lopez's age motivated American Family's decision to displace her. With respect to race as a motivating factor, there are three key pieces of evidence that must be considered on de novo review and that the district court necessarily ignored in rendering its opinion. American Family, one, mirrored a de-emphasized Hispanic market in Ohio. Two, scored its selection measure in a discriminatory manner favoring younger non-Hispanic applicants, and three, failed to transfer Ms. Lopez into another position like it did for the non-Hispanic displaced applicants. American Family Marketing Liaison Luis Bessis American Family is unusual in that it focuses more on minority customers. Am I correct about that? Did the record show that? That they're unusual in their focus? Focus, yeah. They look for customers in the minority community. I don't know if that's necessarily the case. They certainly had a marketing liaison at one point in Ohio whose focus was on marketing to the Hispanic community and the African-American community. American Family's Marketing Liaison Luis Bessis stated that American Family began de-emphasizing the Hispanic market in Ohio. And American Family readily admits that it attempts to mirror its market. So it displaced and terminated its only Hispanic market. When you say it attempts to mirror, you mean its employee makeup? How are you mirroring? What's mirrored? The market that they're attempting to target. Yes, mirrors. What would match up with that? Their employees, their management structure. That's what I mean, their employees. Correct, their employees, their management structure. They were attempting to mirror the markets that they were targeting to sell insurance. They were able to go sell to like customers. Correct, correct. They have a theory that if they're able to hire, for example, a Hispanic manager, that that individual will have more success selling policies to Hispanic individuals. Do the managers sell? They do not. But Ms. Lopez was asked by her supervisor, Ms. Jackson, to help recruit Hispanic agents that would then target the community. Then why offer her the agent position? They didn't know she wasn't going to accept it. They offered her Hansa's position. She would have been the one targeting the community. We don't believe that the offer was illusory. There never was an offer. While Ms. Jackson states that she offered Ms. Lopez the Hans Hansen agency, the offer was illusory. Every time Ms. Lopez pursued an opportunity with American Family after her displacement, she was told that that position was not available to her. And, in fact, Ms. Lopez – She had turned it down. She had turned it down. Then they offered his work to the other agents who were already there. And after they had done that, she said, no, I want that position. I think the record would show, Your Honor, that the policies had not been dispersed to other agents when Ms. Lopez said she wanted the Hans Hansen agency. She told Ms. Jackson that she was taking the Arizona opportunity when she was told that wasn't actually being offered to her. She told Ms. Jackson she wanted the Hans Hansen agency. And I think the record does reflect that the policies at that time had not been dispersed to other agents. She was simply – But she had given the direction to disperse them. Excuse me? She had given the direction earlier that day to distribute them among the other ones.  She had given that direction, but the policies had not been – I understand, but, I mean, they offered her – You say it wasn't a real offer. They offered it to her, and then they held it open, right? Until she said she didn't want it. The record reflects that Ms. Jackson did not have authority from her supervisor to enter into an agency agreement with Melinda Lopez on the Hans Hansen agency. And it also reflects that she didn't interview for the Hans Hansen agency position, which is the exact evidence that American Family claims is why she wasn't technically offered the Arizona position. But who was she interviewing with? It was right in her territory, right? I'm sorry. Wasn't the Hans – what is it? Hans – Hans Hansen agency. Okay, Hans Hansen, but wasn't that within her territory anyway so that the people that she would interview with already knew her? It was in the state of Ohio. It wasn't in her former territory, but certainly it was in the state of Ohio. But the same people who were her bosses then would still be her bosses, right? That's correct. Okay, so maybe – what's the point of interviewing? They had already gone through an interview process. Why would they re-interview her? Well, I agree with you, Your Honor, but why would they interview her for the Arizona opportunity? Because wouldn't she have different management out there? She would have different management, but she had a significant history of performance in that position. Furthermore, the failure to place her in a different position only relates to her termination, and that was after she was discriminated against in the displacement process. But are you saying if they had offered her the Hans Hansen work the day before and she had accepted it the day before, before the policies had been dispersed, that the company would have found a way to not let her take that position? That is our position because the policies hadn't been dispersed when Ms. Lopez accepted the position. When she told Ms. Jackson, I want that position, the policies had not been dispersed. And, in fact, the evidence... I don't know if it matters particularly, but if you're managing an agency and one person declines an opportunity, do we know whether the feature that she's already mentioned to the other agents that you'll be getting these new policies? I mean, they hadn't been dispersed. There could have been promises. There could have been some discussion that would make it quite awkward to change gears. The timeline that we're talking about is a matter of maybe a day here. So I don't believe there's any, and there's no evidence in the record that other agents had been informed that they would be receiving these policies. And, in fact, the record shows that the company did an analysis and found it would be better to replace the agent, Hans Hansen, rather than disperse the policies to other agents, that it would benefit the company to replace that agent rather than... So all of that happened in the same 24-hour kind of period, right? The analysis? Yes. The analysis had been done earlier, long before. And do you dispute that all of the employees in her position were pretty much clustered around the same performance? I know that she had the highest bonus, but do you know the bonuses that the others got? Offhand, I don't know exactly what the bonuses were across the board, but Ms. Lopez certainly had a history of having the highest bonus. She had received positive performance evaluations, salary increases, and had no personnel. I understand, but their explanation is that they were all clustered around the same point in various positions, but all very, very close. Do you dispute that? I do not dispute that, Your Honor. When you say... So you're claiming that... Are you saying that it's their policy to have African-American managers recruit African-American salespeople to sell to African-American clients and Hispanic managers to recruit Hispanic... I mean, is that the policy, that you go out and you sell to somebody that looks like you? That's what they were doing. I don't know that there's a written policy, Your Honor, but certainly that's what was happening. Ms. Jackson testified that after she... that she hired Ms. Lopez and asked her to help recruit Hispanic agents to sell to the Hispanic market, and Luis Bessis was placed in Ohio to help target the Hispanic market. And then he was told that they were de-emphasizing the Hispanic market and he was moved out of Ohio. The scoring process for the selection measure that was used was scored in a discriminatory way. For example, Ms. Lopez received a score of 4 on the employment experience factor, while Ms. Singer, a younger Caucasian individual, received a 3. If you look at pages 1324 to 1326 of the record, you'll see the interviewer's summary of the applicant's relevant employment experience. No matter how you add that up, Ms. Lopez had more experience than Ms. Singer. So which was a higher score? Ms. Singer received a higher score than Ms. Lopez. 3 is higher than 4? Ms. Lopez received... I apologize. Ms. Lopez received a 3. Ms. Singer received a 4. I apologize. I misstated that. No matter how you add it up, Ms. Lopez had more experience than Ms. Singer, yet Ms. Singer was given a higher score. So they made other comments, that she used the same PowerPoint or they didn't like her answers to certain questions. Do you have the other answers? I mean, did you go through just... Are there comparisons that you make that show that the scoring was invalid? Yes. On pages 1324 to 1326 of the record, you will see where the interviewer summarized their experience, and it's clear from that summary that Ms. Lopez's experience was more significant than Ms. Singer's. I'm not talking about just experience. I'm talking about the other answers. They find fault with a number of her answers because the experience itself wouldn't have made up the difference at one point. So there are a bunch of scores, and I'm asking you whether you looked at the other interview sheets and you have anything to point to that shows that it was all subjective and false. I see that my time is up. May I answer your question? Of course. This court noted in Wright v. Murray Gard that where an employee produces evidence to establish that the employer failed to make a reasonable decision, thereby making the decisional process unworthy of credence, any reliance placed in that process cannot be said to be honestly held. Therefore, looking to other questions that were much more subjective than this objective one when the objective measure was clearly improperly scored doesn't make sense because the scoring process was not reliable, and as a result the scoring of the selection measure that was used is unworthy of credence and should not be relied upon on the basis of summary judgment. All right, counsel. Thank you. You have your rebuttal. Yes, you may approach. Good morning. May it please the Court. My name is Emily Wilczek, and I'm here today on behalf of defendants at Police American Family Mutual Insurance Company. We do not believe that the district court erred in finding no issues of fact on appellant's claims. With respect to the race claim, we do not believe that there has been any showing that race played a motivating factor in the reduction of force decision. Is it your policy to hire managers to reflect the target? We do not agree that the record shows that. What happened is at a deposition, State Director LaTanya Jackson was asked, do you attempt to mirror the market? And she stated, as a goal, yes, we do attempt to mirror our market, meaning that they would like their agent base to sort of match the market makeup of their consumers. If that wasn't your answer to Judge White, then yes. Yes. I guess the management aspect, you know, I don't agree that there was a goal in the management level. Ms. Lopez here was in a district manager position that overlooked at the agent, so I think that statement, the way I interpreted it in the record and the way I understood it, is she was saying that the selling, the agents that were selling. Did she have predominantly Hispanic agents? No, no. And actually, there's no evidence in the record of what the market makeup was in this particular area in Ohio. It was just spoken as an aspirational ideal. I think it just made sense for the company to say we would like to mirror our market. It isn't a hard policy. There isn't any numbers that were presented that this was a factor at all. Okay. So even though she was Hispanic and she was asked when she was hired to help get more Hispanic agents, she did not have predominantly Hispanic agents under her? I believe that's correct, yes. There wasn't evidence in the record on that particular fact, but yes. Okay, and why? I mean, this woman is obviously very confident. She had all these bonuses. She's been there a long time. You say you're going to try to have everybody land on their feet. How come when Ms. Jackson got the phone call that the job fell through and she hadn't dispersed them, why didn't she say okay? We disagree that she hasn't dispersed them. I think that's a technicality of whether they physically were given to a particular agent. That process had started. Okay, do you disagree with your sister here that it was only a day or two? No, I agree with that time frame. I do disagree with her. I don't believe that the record supported the analysis that it was better to replace the Hans Hansen agency. I believe that the record was showing that the analysis was that it was better to distribute them. That's not the question. The call came in. She gave the instruction in the morning, right? And that afternoon the call came in that she wanted the book. So it was the same day, right? No, I believe it was the next day. I believe the offer went out to her around, I want to say, February 28th, 29th of 2010. She declined it March 2nd, 2010. On March 3rd, she got an e-mail back from Ms. Lopez that said, Latanya, turns out I may need that agency after all. If this other opportunity in Arizona that I'm pursuing, other than the agency that she found out didn't work out, she was also pursuing a different call center type job, I believe. If that one doesn't work out, then I'm going to want that one that you offered me and I already told you I didn't want. The next day she said it? Yes, correct. Okay. But Ms. Jackson by that point had already, when she said no on March 2nd, had already said, Okay, let's start the process and distribute them to existing agents within the geographic area. We're really focusing like a laser on that point, and you don't have a good answer. She had already started, but your opponent says she hadn't started. Well, I disagree with that. And the record is clear. The record shows something? Yes, the record is clear. Ms. Jackson says in her testimony that she had already started the process to distribute it. Yeah, what does that mean, she had started the process? Well, they have to, when an American family distributes policies to existing agents, they look at the geographic area of the policies, the clients, and they put it to the agent that best matches that geographic location. They want to try to match up a customer to their closest agent. So I think they do analysis. They also, I'm not too sure if it's where it is in the record, but they also look at, there's certain criteria they look at when they decide. How far did they have gotten when she said no on the second and then said, wait a minute, on the third? So how far did they get? I don't know how far they got. That wasn't really parsed out too much in the record other than she had started the process. I think the big focus on that, though, is what is an American family's duty to back end and say somebody rejected an offer, came back and said, never mind, I may want that if this other thing I'm pursuing doesn't work out. I think the point you might want to make here is that even the day after, it wasn't I want. Correct. You're right. It was I want conditionally if. It was I may need it if I can't get this other thing to work out. Right, but it wasn't her fault. I mean, did she stall on those other things? Well, I would respectfully disagree that it wasn't her fault. In the very beginning of this reduction in force process, a timeline was clearly communicated to all the district managers, and that was this. We're going to go through this interview process. We're going to select the ones that are going to be able to fill the restructured positions, and then you're going to have until March 31, 2010 to find alternative employment. She knew that timeline. She was pursuing this opportunity in Arizona. She personally believed it was an offer or there was a potential for an offer. There was no offer ever communicated to her in Arizona. There was a, hey, this is out here, you want to look into. Didn't she testify that somebody said to her, it's yours if you want it? I believe she may have testified to that, but the people in Arizona. But why isn't that a question? It doesn't have anything to do with the bottom line of the fact that they made her an offer. First, I just don't think that race. I think our bottom line here we have to keep focusing on is not so much of do we agree with what was quote-unquote fair in an idealistic situation of what you'd want to do. You're looking at is race here the motivating factor? But you figure that out by conduct. It's the only way to figure it out. But I don't think there's anything in the record that says what happened in Arizona and the fact that her race played any role in all this. And the bottom line is that the company did a standardized process. Okay, a totally subjective standardized process, if you want to move on to that. Totally subjective. There's nothing objective about it except possibly experience. And there's reason to believe that that score wasn't fairly scored. And when you use a subjective process, it's not entitled to the same deference as an objective process. So you have somebody who's top-performing, maybe by a margin, but top-performing. You ask her questions. To me, her questions were responsive. I don't have other people's questions that I know of. I mean, I ask counsel to compare them with, but they don't seem unresponsive to me. And then when it comes to experience, it looks like you don't give her the credit that she's due. You give someone else. You find a way to give someone else a better score. And then she testifies that she was told the job was hers if she wants it. You disagree, but that's what she testifies to. And then she takes your job. I mean, you're saying there's no evidence of race discrimination, but this is the kind of thing that a jury could ‑‑ this is the only kind of evidence you ever have unless it's a direct evidence case. With respect to the subjective criteria, I would point you to Browning v. Department of Army. That's 436F3D692. And in that case, the Sixth Circuit said that an employer's reliance on a subjective criteria does not support an inference of race discrimination. And bottom line, employment discrimination laws do not diminish the lawful traditional management prerogatives in choosing nonqualified candidates. Now, with respect to that employment criteria, that employment point, that point she's debating on that employment, she was nine points lower than the last person who made the cutoff of the nine restructured positions. So whether or not she could have had a point there, the company felt that she was a three under that. That one point doesn't make a difference. It doesn't make a difference if that's the only thing, but it gives you a reason to doubt the other scoring. Except for there was no showing that the other ‑‑ there was no dispute that her ‑‑ she admitted in ‑‑ so one of the criticisms, the main criticism was that what the company had focused on in this process was her interview and her presentation of a business plan for the future. They wanted to see what the district manager saw for the future. And so she ‑‑ one of the criticisms was that she just presented an existing business plan. There was nothing new about it. And she admitted in her deposition. What she did is she brought the same business plan that she did for her 2006 interview. She did that one again. She just put new numbers in that she had from existing American Family Reports. So I don't think that there's anything in the record that draws a dispute into what she did in her interview, her business plan. I don't think there's any evidence in the record to dispute that earlier factor. If she's the top performing manager, why is the same business plan insufficient if you've renewed it with the new numbers? I would disagree with the position that she was the top performing manager. The record says that the performance among them was pretty consistent. Yes, she did score high in a bonus in one year. So did other district managers. The record shows that she did receive good reviews, but she also was counseled by her boss, State Director Ms. Jackson. So I don't think that she was the highest performing district manager, and that's just not supported by the record, that contention. And as for this particular, I guess, question about the business plan, they set an objective is that they believe the market was changing. They wanted to see where these district managers saw a vision for the future. They didn't want to see existing numbers that they have already created. If they believe the market's changing and they've de-emphasized the Hispanic market. We disagree with that contention, that there was a de-emphasis of the Hispanic market. I just want to point out that statement is Ms. Lopez's testimony about what this particular individual supposedly said to her two years prior to this reduction in force. We believe that's hearsay. In their reply, they said that they think it falls within a hearsay exception for a statement by an employee, but there's nothing in the record that shows that Mr. Betz would have that in his scope of employment. What we do have in the record is direct testimony from the State Director Latanya Jackson, flat-out denied, decision-maker in this case, no de-emphasis of the Hispanic market. It would be contrary to growth for the company to de-emphasize in any particular customer base. Let me ask you a question again. You said that they had until March 31st? Correct, to find some. What the company did is they would agree to keep them on payroll until March 31st. Okay, so why? And my understanding, again, that it was the same day, that it was the morning of the 5th. Tell me if I'm wrong on this, that Jackson told Stroud to redistribute those policies and it was 6 o'clock the same day that she said, wait, I may need them. That's correct. Okay, well, you told me it wasn't the same day. I'm sorry about that. I thought the time frame was March, I thought it was the following morning. I'm sorry about that. Okay, so then I think it's a legitimate question to ask you what had happened in those intervening hours. I mean, was there testimony? The testimony that was given on the record is that they start the process, which is a process where they have to just start aligning where the policies match the geographic area. There is, in particular, testimony on the exact minute details of how that is. What the testimony was is she rejected the offer. Management then said, okay, we're going to distribute these policies, and then she came back with an email and says, hold up, I may want those policies if I can't find something else in Arizona by that time frame. And they just didn't want to wait any longer. Is that it or what? They had made a decision, so I don't think it just didn't make logical sense to them to back on a decision on somebody who is making a conditional acceptance of something they've already rejected. Well, that's an answer. I mean, before you weren't given. And then, but this is March 5th, and she has until the 31st, right? To find something within American Family.  With no other offer, no other anything guaranteed on the other end, and she chose to reject this one. And how many agents were involved when they disperse his policies? How many people thought they were getting those? I'm not too sure that is in the record. I'm just not too sure that the exact number of how that, who that was all, how the breakdown of that was. That really didn't, they didn't go into, we didn't go into that much in the record. And is there any evidence that they needed to be serviced? That holding up the reassignment was causing a problem for the policies? I wouldn't say that particular factor is in the record. Then why wouldn't it make sense to say, okay, just hold off on that? I mean, we know where we think they're going, but it may be a problem, so just hold off. From American Family's perspective is they made this offer to Ms. Lopez. She turned it down. They moved forward. They made a business decision at that point to move forward with transferring these two existing agents. I believe the record shows that that was what the study showed was better for them, too. But bottom line is she turned it down. They made a decision to move forward. And there's nothing in the law, there's nothing that requires them to back end a decision because somebody comes back. If you offer something to somebody, they reject it, and they come back and conditionally say, I may want it. There's nothing that requires American Family as a business to stop their processes and stop their decisions because Ms. Lopez isn't quite too sure what she wants to do. And then this other job in Arizona, basically they approached her, right? I believe that as she was looking out at potentials, there was a potential with this district manager, and I believe that Latanya Jackson might have been trying to help Ms. Lopez look at different things. And Mr. Stand, a district manager out in Arizona, had an agent that resigned, and so initially he did a courtesy call to Ms. Lopez just to give her some background. No offer was made. It was just a discussion about we may have this agency out here in Arizona. There was nothing definite about this. Your time has expired. We'll find that in the record, I believe. All right, thank you. Thank you. It's important to remember that there were two adverse employment actions here, a displacement and a termination. There is a question of fact that race motivated the termination. Ms. Lopez pursued numerous opportunities after her displacement with American Family. It wasn't just Arizona and Ohio. There were two manager opportunities that she pursued, and Ms. Jackson sent her an email saying that they would give her time to complete that process. That's the only reason. So for purposes of your persuading this panel, how long does that mean? Six months? It means until the process is complete. Ms. Jackson sent her an email that said, My company is interviewing you for this position, and I'm going to give you the time you need to see if that position pans out. That's the only reason that Ms. Lopez – Which position are we talking about? It was one of the – Arizona? No, this was a bilingual manager position. It's the one that Ms. Lopez references when she conditionally accepts the Hans Hansen agency. When you reference – Do you call that a conditional acceptance when she says, Keep that open for me. I may need it. I don't believe it was conditional acceptance because I believe Ms. Jackson knew that Ms. Lopez wasn't going to get any position with American Family. She knew she wasn't going to get the bilingual manager position, and despite that, she didn't – Okay. Will I find that – I'll be as convinced as you are when I read this record, that there was this under-knowledge by the management that she would never get any of these, so it was all a ruse? They told Ms. Lopez that she had X amount of time to find another position with American Family. She interviewed for two manager positions. She was offered an Arizona position. When she accepted it, they didn't give it to her. She was offered the Ohio opportunity. When she accepted it, they didn't give it to her. And then afterwards – You're saying when she accepted it, they didn't give it to her. Are we still talking about the one that she rejected and then wanted back? Yes, in the same day, yes. But she didn't accept it, did she? She didn't accept it, did she? She wanted it. She wanted a position with American Family. She tried to get all of these positions. Did she say, I might still need it, or did she say, I'll take it? She said, I might still need it if I don't get the position that you told me, Latonya Jackson, you would wait for me to complete the process of applying for. Right, but then she told her, I don't need it. Didn't she say, look, can you hold that position that you offered me open because I might need it? And Jackson says, yes. Right? And then after that, Lopez says, it's okay, I don't need it. Is that fair? I'm sorry, can you repeat the question? Early on, she is offered the Ohio Hansen position. And she says to Jackson, can you hold that offer open? I might need it. Let me see what's going on with these other positions. After that, and Jackson says, yes, she holds it open. After that, she tells Jackson, I'm not going to need that position. And then the next day, Jackson starts distributing, and she calls back and says, well, I guess I do need it. Or she doesn't say, I'll take it. She goes, please keep it open. I might need it after all. I dispute that the record shows that Ms. Jackson had started distributing the policies. Her boss, Rich Stephan, testified that, on page 108 of the record, that the policies had not been dispersed at the time that Ms. ---- Okay, she started the process. She had sent an email. Okay. But do you agree that, I want to make sure I have the facts right, because my understanding is this phone call that said, or this email that said, I don't need it, came after the interval in which Jackson had extended it because she might need it? I'm sorry, can you repeat the question? Do you agree that she was offered the position, her response was, after a couple of days, can you keep it open for me as I explore? Can you keep it open for me? And the answer was, yes, we'll keep it open for you. Then, after that, Lopez says, I don't need it. I disagree that the original discussion about the Hans Hansen agency was an offer of that agency to her. I believe that Ms. Jackson talked to Ms. Lopez about the potential that the Hans Hansen agency may be coming open, it may be on the market, but I don't believe that was an offer. Okay. Do you claim that the call on the 5th, that she might need it after all, was an actual acceptance? Did she say, wait, I'll take that book? Yes, I believe Ms. Lopez was attempting to accept any offer of employment, continued employment with an American family that she possibly could. At that point, she was ready to accept it and forego exploring other options? I believe she was ready to forego exploring other options. Okay. And she communicated that? I believe she communicated that. Okay. And then one last question, what is this bilingual position? Is that one of the Arizona positions? That was one of the two manager positions that Ms. Lopez originally applied for. So she applied for two manager positions. Then there was the Arizona agency position. Then there was the Ohio opportunity. And after the Ohio opportunity, Robert Sturgill. Let me just answer my question. The bilingual position, was that one of the two Arizona positions? I believe that that position was a corporate position, but it may have been housed in Arizona. Is that the one that she claims the person said it's yours if you want it? No. That was the Arizona agency position? That was the Arizona agency. Okay. At what point in this was she pursuing the bilingual manager position? Throughout this entire process, she was interviewing for a bilingual manager position. She applied for the bilingual manager position as soon as she was informed that she was displaced as a district manager. And when did she hear about that one? Not until after Ms. Jackson told her she was not getting the Hans Hansen agency. Okay. So that was still out there. And then was that affected by the expense reports or anything? Did you depose the person? Who made the employment decision on that one? The employment decision on the expense report? Bilingual manager. That individual was someone at corporate. But Ms. Jackson called not only the person in charge of that position but also the person in charge of the Arizona agency and told them about this investigation before any findings were made about Ms. Lopez. And then Ms. Lopez was not offered either of those positions. And that's okay. I think that will wrap it up. I just have one more question. I'm sorry. Do you dispute this whole thing about the expense report? We dispute that it was a terminable offense or that it had any bearing on the displacement or the termination of Ms. Lopez. Okay. Thank you. We have your matter. We'll consider it carefully. And you'll receive an opinion in due course.